## PEOPLE v. FAGAN.

### No. 20,938; August 15, 1893.

#### 33 Pac. 846.

**Larceny—View by Jury.**—On a prosecution for the larceny of cattle, it is error for the court, jury, counsel and officers of the court to go to a neighboring corral to examine the brands on certain cattle; when such examination is not conducted as a part of the regular trial—neither the cattle nor the brands being offered in evidence, nor defendant given an opportunity to object—since Penal Code, section 1119, authorizing the court to order the jury to be conducted to the place in which the offense was committed, or other material fact occurred, does not apply to such case.

APPEAL from Superior Court, Stanislaus County; William O. Minor, Judge.

Frost Fagan was convicted of the larceny of cattle and appeals. Reversed.

James H. Budd, L. J. Maddux and Robt. Farrell for appellant; Attorney General Hart and L. W. Fulkerth, District Attorney (T. A. Coldwell of counsel) for the people.

TEMPLE, C.—The defendant was indicted jointly with his father, whose appeal was recently disposed of here (People

*v.* Fagan, 98 Cal. 230, 33 Pac. 60), and William Ducker.
They had separate trials and the cases, as presented in the
record, differ widely. By this record it appears that one F.
Weyer had about two hundred head of cattle on the Booth
ranch, in the county of Stanislaus, twenty-two miles west of
Modesto. On the second day of October, 1891, twenty-one
head were missing. Nothing was known as to the mode or
cause of the disappearance, but on the 8th or 9th of the same
month seven animals were found by William Grummett on
the Howard ranch. Grummett had charge of Howard's stock
and had some belonging to himself. At the suggestion of
Howard, he put the strays in with his own. On the 13th, four
more animals appeared, and were taken by Grummett. How-
ard, on the 16th of the month, having heard of Weyer's loss,
notified Purvis, sheriff of the county, of the presence of the
cattle. On the next day, Purvis and McGinnis, a deputy con-
stable who was looking for the cattle, and had offered a re-
ward for their recovery and the apprehension of the thief,
supposing them to have been stolen, went to Howard's ranch,
and examined them. The animals had been freshly marked
and the brands altered. The marks were a crop off one ear
and an underslope of the other. Weyer's brand consisted
of a mark resembling a capital L, when turned one way, and,
inverted, resembled the figure 7. The cattle were thus
branded. It had been changed by connecting the horizonal
line with the perpendicular mark at each end, making it a
square. Thus altered, both marks and brand bore a close
resemblance to the marks and brand used by the defendant.
The sheriff told Grummett to keep the cattle until some one
called for them, and then immediately notify him. These
cattle were subsequently identified as a portion of the twenty-
one head which had been lost by Weyer. Defendant lived
with his parents at Modesto. His father had recently taken
up some land in the Coast Range, about nine miles from How-
ard's, intending, as he said, to homestead it. His father had
a small cabin there, and had gone there about the 1st of Octo-
ber. Defendant's witnesses testified to facts which, if true,
proved that defendant was at home on the night of the 2d of
October, and also on the 3d and 4th of that month. Defend-
ant had cattle of his own, and, according to his testimony, on
the 14th of October drove some fifteen head into the Coast

Range near his father's cabin, and remained there at his father's place until his arrest, on the 20th. On the 18th, Grummett visited the Fagan cabin, and told defendant about the eleven head which were at Howard's, describing their marks and brands, when, according to Grummett's testimony, defendant said they were some cattle he had recently purchased and re-marked, and said he would take them away. Defendant, on the stand, denied having said that he had recently bought or marked any cattle, and said he knew nothing of the cattle lost by Weyer. He had neither taken nor marked any of them. He said, however, he had lost some of his cattle and was looking for them. He testified that ten head of his were never found. The eleven head were taken from Howard's place on the 19th of October, about noon, while Grummett was at dinner. During the afternoon, Grummett missed them, and found that a gate which had been locked had been lifted from its hinges; that there were cattle tracks through the gate and also those of a horse. He telegraphed to Purvis, who came over that evening, bringing McGinnis with him. They, with Grummett, followed the tracks to a canyon leading into the Coast Range, called "Ingram Canyon." Three ravines, not far apart, led into the mountains. Washington canyon is the more northerly, then Curran canyon, and then Ingram. High ridges divide them from each other. They terminate near together at a mountain called "Oso," near which Grummett and his brother had a place. About 4 o'clock in the morning of the 20th they reached the Fagan cabin, where they found the eleven head in a corral within a few feet of the cabin. In the cabin they found the defendant and his father in bed, while William and Ed. Ducker were lying by the cabin on the outside. When asked by the sheriff if the cattle were his, defendant replied that they were not; that they were strays, and he did not know how they got into the corral. Charles Fagan said that he and Will Ducker put them into the corral, and that Frost knew nothing of it. At the trial, Ducker testified that defendant was cooking supper when the cattle appeared there, not driven by anyone, and muddied their spring, whereupon Charles Fagan and he put them into the corral. The defendant also said that he had about thirty head of cattle in the range, and some of the posse made search, and found two head near Mt. Oso, which were marked and branded in

the same mode as the eleven head. Afterward, November 21st, three more were found near Mt. Oso, three and one-half miles from the Grummett cabin. They were marked and branded similarly to the eleven head. They were taken to Modesto, and placed in Mr. Young's corral, and on the trial were identified as Weyer's cattle, and as having been missed on the 2d of October; but they were not part of the eleven head, with the larceny of which, it was assumed at the trial, defendant was charged.

The court required the prosecution to say whether they prosecuted the defendant for a larceny committed by the taking from the Howard place on the 19th, or from the Booth ranch on the 2d. The district attorney said he claimed that the taking was from the Booth ranch on the 2d. If, therefore, it can be said that the defendant was found in possession of the cattle at all, it was not until eighteen days after the taking; and it was only from the circumstances recited that it could be inferred that even then defendant had any possession or control of them, by himself, or jointly with his codefendants. And the evidence was conflicting as to the existence of every one of these circumstances, except the fact that the cattle were found in his father's corral while he and three others were at the cabin. It is impossible to make out from the statement in what respect the defense claimed that the marks and brands upon the cattle alleged to have been stolen differed from the defendant's marks and brands. But a great deal of evidence was put in upon the subject upon both sides, much of which consisted in illustrations upon the blackboard, or the examination of sensible objects, the force of which we cannot appreciate. To enable the jury to compare these marks and brands, there was exhibited to them, against the objections of the defense, a hide alleged to have been taken from an animal claimed by the defendant. It was not the hide of an animal alleged to have been stolen, but was exhibited merely to prove what the defendant's marks and brands were. I think the evidence insufficient to show that the hide was from a steer belonging to the defendant, or that it had not been tampered with, but I pass to what I deem a still plainer error.

After examining the earmarks upon the hide, the court, with the jury, clerk, sheriff, and counsel, went to Young's

corral to examine the three head which had been found, November 21st, near the Grummett place, in the Coast Range, of course for the purpose, in part, of comparing the marks with those upon the hide. These three animals the defendant was not charged in the information with stealing, nor was it shown, by direct evidence, at least, that he had ever seen them, or that he knew anything about them. This action of the court was against the objection of the defendant. This course is not authorized by section 1119 of the Penal Code. The cattle and the marks were not offered in evidence, so as to afford the defense an opportunity to object, nor had they the opportunity to call the attention of the jury to variances between the marks and those of the defendant. Upon this point, see People v. Fitzpatrick, 80 Cal. 539, 22 Pac. 215.

When the defendant was on the stand the following occurred: "Question. What is there about this hide? Answer. This hide? Q. Yes, sir. A. Well, I don't know whether it is the same bullock or not. Sam Miller sold a bullock that belonged to me. Mr. Fulkerth: We shall object to that, that it is immaterial what there is about that hide. They can dispute the conversation, if they want to. The Court: That is your hide. Mr. Ferral: What is there to this hide that has been offered in evidence? So he may have the right to explain any connection he has with it. The Court: I think that it is too general a question. I will sustain the objection. (The defense reserved an exception.)" I take it that the remark of the judge, "That is your hide," was merely intended to tell the witness that it was the hide offered in evidence. The question, with the explanation, which must be taken as a part of it, was not too general. It could hardly be made more specific without being objectionable. The objection made and sustained was that it was immaterial, as the defendant could only deny the conversation in which the defendant was reported to have said that the marks on the animal killed were his. The defense, having taken an exception, pressed the matter no further. What explanation could have been given, we do not know; but many possible ones may be imagined, which would have destroyed the entire value of the evidence, if believed by the jury. That the evidence was most material is evident. The identity of the marks and brands recently made on the cattle with the marks and brand

of defendant was the most important fact testified to for the people, and the exhibition of the hide and the marks and brands on the cattle in Young's corral was the most forceful evidence of the fact. For this reason the judgment and order must be reversed.

The exceptions to the instructions are mainly the same as those made in the recent case of People v. Fagan. In that case the court deemed it unnecessary to consider and determine these questions. It is not more necessary to do so in this case.

We concur: Vanclief, C.; Searls, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order appealed from are reversed.