STATE OF NEVADA, RESPONDENT, v. NATHAN L. MERRITT, JR., APPELLANT.

No. 3547

December 12, 1949.                    212 P.2d 706.

*Royal A. Stewart* and *Emile J. Gezelin,* Associate Counsel, both of Reno, for Appellant.

*Alan Bible,* Attorney General, *Homer Mooney, Geo. P. Annand* and *Robert L. McDonald,* Deputy Attorneys General, *James W. Johnson, Jr.,* District Attorney of Churchill County, and *A. Loring Primeaux,* Associate Counsel, of Fallon, for Respondent.

## OPINION

By the Court, HORSEY, C.J.:

The appellant will be referred to in this opinion as the defendant, as in the lower court.

The defendant, Nathan L. Merritt, Jr., has appealed from the judgment and from an order denying his motion for a new trial.

The defendant, by the verdict of the jury, was found guilty of the crime of grand larceny, upon the conclusion of the trial, on the 13th day of July, 1948, in the First

judicial district court of the State of Nevada, in and for the county of Churchill.

The offense upon which the defendant was convicted is contained in count 3 of the information, filed May 10, 1948, in said district court, and is as follows:

"Count (3) Did then and there, wilfully, unlawfully, and feloniously mark and brand and alter and deface a mark and brand then and there existing upon one (1) black (white-faced) bovine cow, not their own property nor the property of either of them, but belonging to and being the property of Walter L. Nygren, with the intent thereby to prevent the identification thereof by the true owner."

On May 25, 1948, in connection with the arraignment before the district court, and upon the request of the district attorney that the charge against the defendant, William O. Sizemore, be dismissed or discharged in order that he might be enabled to testify for the state, such order of dismissal or discharge as to Sizemore was granted.

Upon the defendant, Nathan L. Merritt, Jr., having, as aforesaid, been convicted, upon the completion of the trial in the district court on the 13th day of July, 1948, and further proceedings having been had, including the denial of a new trial, the said defendant was, on July 27, 1948, sentenced by said court to be committed to the state penitentiary at Carson City, Nevada, for a period of not less than one year nor more than fourteen years.

The defendant's notice of intention to move for a new trial, upon the denial of which, on July 27, 1948, the defendant's notice of appeal was predicated, contained the following grounds:

"I

"That the Court has misdirected the Jury in matters of law.

"II

"That the Court has erred in decisions of questions of law arising during the course of the trial.

## "III

"That the verdict is contrary to law, and that the verdict is contrary to the evidence.

## "IV

"That new evidence has been discovered material to the Defendant, and which he could not, with reasonable diligence, have discovered and procured at the trial.

## "V

"That the Jury has received evidence out of Court other than that resulting from a view, as provided in Section 341."

This court is particularly concerned as to the assignments of error stated in appellant's opening brief, and which are as follows:

"1. The Court erred in ordering the jury to go to Kerns Corral, located near Fallon, which is not a place 'in which the offense is charged to have been committed, or in which any other material fact occurred,' to inspect a black, white-faced cow which had allegedly been branded with an M-Swastika brand at Job's Canyon in Dixie Valley in the County of Churchill on or about the 3rd day of March, 1948, by the defendant and the accomplice, William O. Sizemore. Said inspection by the jury was made without the presence of the defendant or his counsel.

"2. That by ordering the jury to examine a cow with an altered brand in a slaughterhouse in the absence of the accused where no part of the offense charged was committed and where no material fact occurred, the accused was denied his liberty without due process of law in violation of *Sec. 1 of the Fourteenth Amendment to the Constitution of the United States of America.*

"3. That the evidence is insufficient to justify the verdict and that the verdict is contrary to law."

In order to consider properly the matters, both of law and of fact, involved in the specifications of errors, it

seems advisable to relate some of the facts and circumstances which appear from the testimony.

Defendant operated a small cattle ranch, which had been homesteaded by his father, about seventy miles from Fallon, Nevada. The father became an invalid, and defendant operated the holdings and took. care of the family. The defendant was in the army of the United States during World War II, was overseas part of the time, and, upon his service being concluded, was accorded an honorable discharge, on March 8, 1946. After his discharge and return to Fallon, the defendant resumed his ranching operations, and bought approximately forty head of cattle to restock the herds, which had been depleted during his army service. The defendant increased his cattle to ninety head, approximately, brought about by leasing about fifty head from one. Ralph Smith. Under such arrangement between Smith and the defendant, Merritt furnished the ranch and the grazing fees, and Smith furnished the cows and bulls. From the lease agreement or arrangement, the increase in the herd was split between the parties.

It appears from the testimony of the defendant that he, Merritt, met one William Sizemore in the fall of 1947, and took him into his home in Dixie Valley, in order to give Sizemore "a place to stay." In payment for his lodging and board, Sizemore helped Merritt in his ranching operations.

Merritt, in his testimony at the trial, stated, in substance, that at Job's Canyon in Dixie Valley, where he maintained a small corral, Merritt and Sizemore were then engaged in the normal ranching operations of branding some of Merritt's calves, on March 3, 1948. Merritt, in that connection, testified that the branding that day consisted of branding three calves. That said three calves, and the three cows to which they belonged, were, upon such branding having been completed, turned out upon the open range. Merritt testified further that there was a black milch cow in the corral that belonged

to Ralph Smith; that it was going fresh, never having been milched, and that they wanted to haul her down before she had a little calf; that "if she had a little calf upon the hill it takes quite a while to get them down. * * * We had one other cow, we kept in the corral with the milk cow to keep her from getting wild and fussing around because she was heavy with calf."

According to Merritt's testimony, it was after the three calves and the cows were turned out that the two game wardens drove up and came over to the edge of the wash; "they didn't say who they were."

It does not appear from the testimony that either of the game wardens, Clogston and Rhodes, said anything in their conversation with Merritt or Sizemore to indicate that any suspicion was aroused in the minds of said game wardens. Quoting from Mr. Clogston's testimony:

"Q. Did they introduce themselves to you? A. Yes. Mr. Merritt called out, 'Who are you?', and we said, 'We are looking around for a place to plant fish', and he said, 'My name is Merritt,' and he said, 'This is Bill Sizemore.'

"Q. Mr. Sizemore was with him at that time? A. That's right. I said, 'What are you doing? Are you branding, dehorning and ear-marking?', and he said, 'Yes.' And I discussed no further with Mr. Merritt in regard to his business in the corral."

The conversation between Clogston and Rhodes, on the one hand, and Merritt and Sizemore, on the other, was pleasant and friendly, and after a short visit of ten or fifteen minutes the game wardens departed.

It may be stated further, from Mr. Clogston's testimony, that the game wardens did not go down to where the corral was. They were about sixty or eighty feet above it. They did not try to get down from an embankment to reach the corral, but stood straight across from, and a few feet above, the corral.

Mr. Clogston, upon returning to Fallon, reported to Dan Evans, a State Fish and Game Commissioner. Mr.

Evans asked Mr. Clogston what he found (referring to the latter having intended to try to detect some "deer poachers"), and Mr. Clogston replied to Mr. Evans: "I believe we have some cattle rustlers."

Mr. Clogston also reported it to Hammie Kent, a rancher out in the Stillwater area, and, on or about March 6, 1948, to Les Moody and Tom Williams. In his testimony at the trial, Mr. Clogston, when asked what he had said in describing the black white-faced cow to Mr. Moody and Mr. Williams, stated: "I described the cow to them that her ears had been severely cut. She had been dehorned. It was a black cow with a white face and I suspicioned the cow of being rustled."

It was at a time nearly six weeks after the conversation between Mr. Clogston and Mr. Moody and Mr. Williams, in Mr. Moody's house, on or about March 6, 1948, that Mr. Williams visited Dixie Valley, doing some riding, and met Mr. Merritt, on April 14, 1948.

In the testimony by Mr. Williams at the trial, he stated, among other things, in substance as follows:

That he, Mr. Williams, was assigned to Dixie Valley by Mr. Moody, then superintendent of the Nevada State Police; that he was to make an investigation on cattle rustling; to check on particular cattle that had brands on over there; that he saw the black white-faced cow in the corral on April 14, 1948. Mr. Williams further stated that he and Mr. Kent went to the Hot Springs in Dixie Valley, and found a small bunch of cattle there, and looked that bunch of cattle over; that the black white-faced cow that he believed to be that which Mr. Clogston had described—checked that cow, and he roped her and threw her down, picked the hair away from the brand so he could make an examination; that the brand on the cow was an M Swastika brand; that, on examining, he found the N4 brand under the M Swastika— straight N, open 4; that the M Swastika brand was over it; that he figured the brand was about two months old— six weeks to two months old; that the cow had been

dehorned not too long before that, and that the right ear was cropped short and the left ear had a half undercrop.

Mr. Williams further testified that he left the cow there with the other cattle, that he later sent a man to gather those cattle and bring them to Fallon; that Irving Sanford, Charlie McKay and one of the Barclay boys were present with him when he, Williams, roped and threw the cow; that it was his order that the cow be brought in; that he did not bring the cow in himself; that he saw the same cow on the 22d day of April, 1948, at Charlie McKay's place, in the corral, and that he was positive it was the same cow; that on the 23d day of April he saw her in the corral at Buck Kirn's slaughterhouse, and later "saw her last Friday and I saw her today," referring to the time of the trial, July 12, 1948. It may be stated that on the 20th day of April, 1948, the defendant, Merritt, was arrested, and his bond was set at $3,000 by Harold Bellinger, justice of the peace of New River Township, Churchill County, Nevada.

From the testimony and the proceedings had, it is apparent that at the time of the trial in the district court the black white-faced cow in the corral at Buck Kirn's slaughterhouse in Fallon, Nevada, remained at that place on April 23, 1948, and continued there at least until after July 13, 1948, the date upon which the trial was completed.

Although it is realized that much could be said to the effect that the facts upon which the evidence is predicated are entirely circumstantial, rather than direct, as to whether or not the defendant actually branded, or caused to be branded, the black white-faced cow at the corral in Job's Canyon in Dixie Valley on March 3, 1948, or thereafter, and prior to Mr. Williams finding the same cow at Hot Springs in Dixie Valley on April 14, 1948, it has not been our purpose, in quoting certain of the evidence contained in the preceding pages, to discuss at this point the sufficiency of any material

evidence. We realize that the evidence is not only circumstantial, as before stated, but very conflicting as to the several witnesses who have testified at the trial, and, unless it is properly required, we should not do so at this time if any other serious or substantial error must be found which would necessitate a new trial. For, in such event, we must, and shall, avoid, in every respect, any indication which might have any influence upon the minds of the jurors in their determinations as to the sufficiency of the evidence.

It is, therefore, in this opinion only for the purpose of making sure that the view alleged in the motion for a new trial and upon the notice of appeal, and in the assignments of errors developed and elaborated in connection therewith, that we have undertaken to determine as to whether or not the asserted view which took place in the presence of the jurors during the trial, at Fallon, on July 12, 1948, in Kirn's corral at the slaughterhouse at Fallon, was such a view as the law and the constitutional provisions which are applicable reasonably require. It has been for that purpose and to that end that this justice, in the present opinion, has particularly endeavored to ascertain whether or not a view such as the proceeding ordered by the honorable district court in connection with the trial at Fallon, on July 12, 1948, was, or could be, such a view as the law contemplates, it being solely for the purpose of determining whether or not such a view may be of the place in which the offense charged against the defendant in the instant case was committed, or in which any other material fact occurred.

The statutes, at least in many states, have employed either precisely or substantially the same, or very similar phraseology. Nevada Compiled Laws 1929, Vol. 5, sec. 10989, is as follows: "Sec. 10989. View By Jury.— Oath Of Officer Attending. § 341. When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been

committed, or in which any other material fact occurred, it may order the jury to be conducted in a body, in the custody of the officer, to the place, which must be shown to them by a person appointed by the court for that purpose; and the officer must be sworn to suffer no person to speak or communicate with the jury, nor do so himself on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time."

In the instant case, while, on or about March 3, 1948, Merritt and Sizemore were busily engaged in the branding, ear-marking and dehorning of certain cattle, Clogston, at least, asked Merritt if he was so engaged, and his answer was, "Yes." What Merritt and Sizemore were doing, at the time, may or may not have been entirely lawful and proper. Merritt, in his testimony at the trial, said it was lawful. After he had seen the cow at Kirn's corral at Fallon, Nevada, at the time of the trial, Merritt stated that he had *never seen before* the black white-faced cow which had been brought to Fallon from Hot Springs in Dixie Valley, by the persons sent there by Tom Williams, and which had been found by said Williams to have been branded prior thereto, and which had subsequently, at Kirn's corral at Fallon, been identified by Mr. Nygren as his black white-faced cow.

Sizemore, whom the state discharged as an alleged accomplice, in order that he might testify at the trial, made a sworn statement, in which, among other alleged facts, he stated the following: "The next morning Nate said, 'Let's go up here. I have some work to do.' We went up and there was these cows that you have here. Seven of them. He branded six and left one black one that he didn't work the iron on. There was no calf on that black cow. I took her down and milked her. The black white-faced cow wasn't in the corral when these wardens came up. There was this black cow that they took down and the brand wasn't worked, and one red

cow that had the brand worked. The others were all worked and were turned out and were out of the corral when these two men arrived. The white-faced cow was with the other bunch that had already been worked. These cows all had the N4 brand on them. The black cow was an N4 cow. Smithy's cow was the cow that we was milking. Mike Casey and Doc Kain. They hauled these cows out there, and they had the N4 brand on them."

The statement mentioned was made on May 10, 1948, and was included in a counter affidavit subscribed before John R. Hannifan, county clerk, the 27th day of July, 1948, by Mr. James W. Johnson, Jr., and presented on the motion for a new trial before the district court, after Roy A. Stewart, Esq. and defendant, Merritt, had both made affidavits, in effect, on the same date, July 27, 1948, that R. J. Vannoy, sheriff of Churchill County, in the upstairs corridor of the Churchill County courthouse, on July 13, 1948, stated that William O. Sizemore "signed a written statement in which he stated on his oath that there was no black, white-faced cow in the corral at Job's Canyon in Dixie Valley in the County of Churchill, on the day and at the time that Bruce Clogston and Clayton Ralph Rhodes, both game wardens, arrived at said corral in search of deer poachers on or about March 6, 1948, as they testified at the trial; that the said signed statement of William O. Sizemore is on file in the office files of the District Attorney of Churchill County, James W. Johnson, Jr."

In two other counter affidavits presented at the time of the motion for a new trial, Tom Williams and James W. Johnson, Jr. each stated that the said William O. Sizemore entered the office of the district attorney of Churchill County, at a time "later than May 10, 1948, the exact date which is not known to your affiant," and, in their presence, stated: "that he was confused and could not remember exactly whether or not the said black white-faced cow—subject of this action—was, or

was not, in the corral at the time the game wardens arrived. Under questioning by your affiant, the said William O. Sizemore stated that at that time, he was excited and to the best of his recollection, he could not recall what cows were in said corral at the time the said game wardens arrived on March 3rd, 1948."

It appears, however, that at the trial, which was either shortly after or shortly before the last Sizemore affidavit, above mentioned, Sizemore's statements of facts were vague, uncertain, conflicting and contradictory. He was an accomplice, and, after much evidence had been testified to by the witnesses for the defense at the trial, it appears that his reputation for truth and honesty was bad. It may have been true, nevertheless, that his evidence, in whole or in part, was truthful, and it is peculiarly the province of the jury to decide as to the truthfulness or falsity of his testimony, particularly as to whether or not the certain black white-faced cow had already been branded, together with the other cows he, Sizemore, had mentioned, and were, therefore, not in the corral at the time of the presence of Mr. Clogston and Mr. Rhodes.

It may be stated that sufficient circumstances, as above set forth, were seen by Clogston and Rhodes at the time they visited the corral, in the presence of Merritt and Sizemore, to have justified the appearance of suspicious circumstances sufficient to have informed Mr. Williams thereof. Likewise, Mr. Williams' inspection of the alleged black white-faced cow at Hot Springs in Dixie Valley, on his visit thereto April 14, 1948, and his detailed examination as to the facts he actually observed as to the two brands the one superimposed upon the other, on the cow, together with the confirmation of facts and circumstances which had been disclosed to him, particularly by Mr. Clogston, were sufficient to have convinced him, at least to the extent of prima-facie evidence, that an offense had been committed, at or near the time at which, in the corral at Job's Canyon, the

actual branding had occurred. These facts were sufficient to have justified Mr. Williams to cause the arrest of the defendant, and his prosecution. And the facts and circumstances within his knowledge would have been sufficient, together with the cooperation of the district court, the sheriff, district attorney and the defendant's attorney, to have justified, we believe, suitable arrangements to have been made for a convenient time at the trial, to have caused a view to be had at the corral in Job's Canyon in Dixie Valley, about seventy miles from Fallon, Nevada.

If, however, certain further but conflicting evidence, whether of the state or the defendant, had been presented, which disclosed that, although certain material facts were shown to have occurred at the corral in Job's Canyon, the actual branding of the black white-faced cow appeared, reasonably, to have occurred elsewhere, and at a time prior to the fact, as found by Mr. Williams, that the branding had actually occurred before his arrival, it would have been entirely proper to have also arranged for an alternative view, or for even a second place in which a view could properly have been had. This, necessarily, would have required that either or both of such proposed views come within the provisions of the statute, and that, within the discretion of the court, and in its opinion, the proposed view, or views, were proper; and that the view should be of the place in which the offense is charged to have been committed, or in which any other material fact occurred.

It is very obvious, however, as to the branding of the black white-faced cow, that, in view of the evidence in the record, the branding could not properly be deemed to have occurred at Kirn's corral at Fallon. This could only be deemed to have been reasonably probable if there had been some evidence in the record indicating that the Nygren, black white-faced cow, which is alleged to have been illegally branded by the defendant, could reasonably have been deemed to have been taken by the

defendant, or some other person, from Job's Canyon in Dixie Valley to Kirn's corral, or in the vicinity near Fallon, and then branded by the defendant, or at his instigation, and thereafter returned to Job's Canyon in Dixie Valley, prior to Mr. Williams' finding of the fraudulent brand upon the cow, at Hot Springs in Dixie Valley, and which is disclosed from the evidence to have been in the near vicinity of the corral in Job's Canyon, in the same Dixie Valley. There is absolutely no evidence in the case to indicate other than that the cow remained at Job's Canyon or Hot Springs, in Dixie Valley, during the time from March 3, 1948, until April 23, 1948, at which time the cow was transported to Kirn's corral, appurtenant to his slaughterhouse.

■ It has been repeatedly held that a view within the meaning of our statute, N.C.L.1929, Vol. 5, sec. 10989, and such similar statutes, does not permit evidence *as such*. A view is merely permitted to enable the members of a jury to see or inspect a place or scene, which, generally, includes premises, buildings, structures, apartments or rooms, inanimate objects existent at such place, or other things then and there existing, and which, in relation to a criminal offense, serve to enable the jury to visualize and comprehend, and perhaps more clearly to understand, actual facts and circumstances which are involved. Such a view is never for the purpose of evidence *as such,* and must not be permitted during a view, for the obvious reason that to permit evidence which can only be allowed at a trial, would violate many of the essentials of a trial, including numerous safeguards which constitutional guaranties have assured, and which are among the most cherished of our Anglo-Saxon institutions.

So serious was the problem considered, in 1934, that the United States Supreme Court, in Snyder v. Massachusetts, 291 U.S. 97, 138, 54 S.Ct. 330, 78 L.Ed. 674, 695, 90 A.L.R. 575, rendered both majority and minority opinions, which were participated in by the very learned

justices of that court during such period. The majority opinion, written by Mr. Justice Cardozo, was concurred in by four other justices, whilst the minority opinion was written by Mr. Justice Roberts, who recently retired from the court, and was concurred in by three of the other justices, Messrs. Brandeis, Sutherland and Butler. The four justices in the minority were considered, very generally, to be among the abler of the members of the court. In the murder case involved in Snyder v. Massachusetts, supra, an attendant at a gasoline station at Somerville, Massachusetts, was shot to death. From the opinion by Mr. Justice Cardozo, certain language is quoted, 291 U.S. 102, 103, 54 S.Ct. 331, 78 L.Ed. 676, 90 A.L.R. 577, 578, as follows:

"Three men, Garrick, Donnellon, and the petitioner, Snyder, joined in the murder and in the attempted robbery that led to it. Garrick confessed to his part in the crime and became a witness for the state. Donnellon and Snyder were tried together, and sentenced to be put to death. The jury found upon abundant evidence that the guilt of each had been established beyond a reasonable doubt. At the trial and on appeal Snyder made the claim that through the refusal of the trial judge to permit him to be present at a view there had been a denial of due process of law under the Fourteenth Amendment of the Constitution of the United States. The Supreme Judicial Court of Massachusetts affirmed the conviction. [282 Mass. 401] 185 N.E. 376. A writ of certiorari brings the case here.

"At the opening of the trial there was a motion by the commonwealth that the jury be directed to view the scene of the crime. This motion was granted. In granting it the court acted under a Massachusetts statute which provides: 'The court may order a view by a jury impanelled to try a criminal case.' General Laws (Ter.Ed.) of Massachusetts, c. 234, § 35. The court appointed counsel for Donnellon and for Snyder to represent their respective clients at the place to be viewed.

Counsel for Donnellon moved that he be permitted to go there with his client after the view, but did not ask that his client be present with the jury. The court stated that such an order would probably be made. *Counsel for Snyder moved that his client be permitted to view the scene with the jury, invoking the protection of the Federal Constitution.* (Italics ours.) This motion was denied. The jurors were then placed in charge of bailiffs duly sworn. Accompanied by these bailiffs and also by the judge, the court stenographer, the district attorney, and the counsel for the defendants, they went forth to make their view.

"The first stopping place was at the filling station, 13 Somerville avenue. Entering the station, the district attorney pointed out to the jurors the particular parts of the building that he wished them to observe. He asked them to note the window at the rear, its position with reference to the entrance, the position of other windows to the right, the size of the room, the angle made by a partition, and the location of other objects. * * *

"After the completion of the view, the group returned to the courthouse and the trial went on. In charging the jury the judge said, 'Now what have you before you on which to form your judgment and to render your finding and your verdict? The view, the testimony given by the witnesses and the exhibits comprise the evidence that is before you.' The question in this court is whether a view in the absence of a defendant who has made demand that he be present is a denial of due process under the Fourteenth Amendment. * * *"

And, in the opinion by Mr. Justice Cardozo in 291 U.S. 105 and, particularly, on page 107, 54 S.Ct. on page 332, 78 L.Ed. on page 678, and in 90 A.L.R. on pages 579 and 580, it is severally stated as follows:

"We assume in aid of the petitioner that in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably

substantial, to the fullness of his opportunity to defend against the charge. * * *

"* * * Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow."

In other words, the majority opinion, as expressed by Mr. Justice Cardozo, recognizes the fact, as repeatedly stated by the supreme judicial court of Massachusetts, that inanimate objects present and connected with the place and scene of a criminal offense would, necessarily, be perceived by the jurors, but that such evidence alone was merely incidental to the view, and would not become evidence until regularly and factually introduced before a competent court and admitted at a trial.

On the other hand, Mr. Justice Roberts, in discussing, very ably, in his opinion, numerous phases of the view involved, among other expressions, stated, on page 134 of 291 U.S., on page 343 of 54 S.Ct., on page 693 of 78 L.Ed., and on page 595 of A.L.R., the following: "If, then, a view of the premises where crime is alleged to have been committed *is a part of the process of submission of data to the triers of fact, upon which judgment is to be founded; if the knowledge thereby gained is to play its part with oral testimony and written evidence in striking the balance between the state and the prisoner, it is a part of the trial. If this is true, the Constitution secures the accused's presence. In this conclusion all the courts, save those of Massachusetts, agree."* (Italics ours.)

The foregoing views of the majority and of the minority of the members of the United States Supreme Court, relative to permitting a view of premises in connection with which a criminal offense has been charged, are dependent, respectively, upon whether or not, in connection with such a view as authorized by statute, *evidence in the legal sense* has been permitted to occur in viewing

such premises. At a view in the proper legal sense, it is universally agreed that no statements, conversations or comments, from either the jurors conducted to a view by order of court, or by any other person, may be permitted. The two different and respective theories of the majority and of the minority in Snyder v. Massachusetts, supra, occasioned difficulty only because of the fact that, in connection with the place in which the offense had been committed, certain physical objects and characteristics, constituting part of such place, may be seen, heard or perceived by the jurors, and which may occur, for the limited purpose of such view, without being deemed, *itself, evidence.* The view of the majority, and that of many states, including that in relation to our own statute, sec. 10989, N.C.L.1929, Vol. 5, considered such a view to be only incidental, whilst the theory, as above stated, on the part of the minority in Snyder v. Massachusetts, supra, earnestly contended that the extent to which such physical objects, their environment and characteristics, necessarily involved more; that the seeing, hearing and perceiving of such objects and characteristics, forming part of the view, necessarily constituted evidence, being *a material part thereof, and could not, without the presence of the defendant, be deemed a view;* that vitally important constitutional guaranties would be violated by such proceedings.

For the purpose of the black white-faced cow involved in the instant case, State v. Merritt, no such situation is involved. In Snyder v. Massachusetts, supra, the statute permitted a view only because a criminal offense had occurred in a certain place in Massachusetts. Both of the opinions in that case were predicated upon the fact that the offense, namely the death of the deceased, had occurred at such place in Somerville, in the State of Massachusetts, and that the "view" was held there. Our statute defines a view as being a "place in which the offense is charged to have been committed, or in which any other material fact occurred." The view in the

instant case did not occur in Job's Canyon, Dixie Valley, or any other place near by, but in a place about seventy miles away, in the Kirn corral at Fallon, Nevada.

The cases in Nevada are in accord in making clear the distinction between permitting a view at "the place in which the offense is charged to have been committed, or in which any other material fact occurred," and permitting a view at which *evidence only* was presented.

In State of Nevada v. Lopez, 15 Nev. 407, the place of the view, held on the order of the district court and to which the jury was conducted by the proper officer, was the place in which the offense had been charged to have been committed and in which material facts occurred. It was fully established, however, that in connection with the view one Chris. Walsh had made certain comments, explanations and statements in the presence of the jurors. Mr. Chief Justice BEATTY, in his opinion as reported on page 412 of 15 Nev., stated:

"It appears by the affidavits, that when the jury arrived at the premises they were sent to inspect, they found there a person named Chris. Walsh, who was never even sworn as a witness in the case, and who, in response to questions addressed to him by members of the jury, pointed out to them all the special features of the premises.

"We do not see how it is possible to say that this was not a violation of the law, and a denial of the right of the defendant to be confronted with the witnesses against him. Indeed, it is not seriously denied that the jury 'received evidence out of court other than that resulting from a view,' etc., but it is contended that Walsh told them nothing more than others—witnesses—had told them, and that the defendant could not have been injured.

"Of course, if it can be made clear that no injury resulted to the defendant from the act complained of, the error is cured. But when it is shown that a clear legal right of the defendant in a criminal case has been

transgressed, it devolves upon the state to prove that he was not harmed thereby, and in this case we think such proof is wanting."

The other two cases in Nevada which are in point are State v. Hartley, 22 Nev. 342, 40 P. 372, 28 L.R.A. 33, and State v. Clarke, 48 Nev. 134, 228 P. 582. In each of these cases there were no material errors, and the cases each were affirmed. In each of the cases the court below had held the view involved in the case proper. The supreme court affirmed, because the view was sanctioned, in accordance with the statute. The view occurred, in each instance, at a place in which the offense was charged to have been committed or in which material facts occurred. The view was not, in any proper or legal sense, evidence, except as to the case of State v. Lopez, supra, and that constituted evidence only as to such conversations or comments.

It is believed that the case of State v. Main, 37 Idaho 449, 216 P. 731, is very much in point when compared to the instant case. In the opinion, on page 734 of 216 P., it is stated as follows:

"On order of the trial court the jury inspected a certain sheep, claimed to be one of the sheep which were alleged to have been stolen by appellant, and which was at the time in a barn near the courthouse. Certain witnesses for the prosecution testified that this sheep originally bore a brand known as the bucketbail brand, which was put on with black paint, and that after appellant secured possession of the sheep, he attempted to efface the bucketbail brand, and branded the sheep with the letter 'O' in green paint, placing it over the bucketbail. Appellant and his witnesses testified that be bought the sheep which were the subject-matter of the controversy, including the one which was inspected by the jury, from one H. H. Main, and denied that he altered the brand. If he did alter the brand, it was, of course, a very suspicious circumstance. The affidavits show that, upon the inspection, one of the jurymen pressed back the wool

of the sheep with his hands, evidently attempting to discover whether the brand had been altered, and then nodded his head knowingly to the other jurymen. Something like a year had elapsed between the time of the alleged offense and the trial, and in the meantime the sheep had been shorn. We are satisfied that the jury were influenced by what transpired at the time of the inspection of the sheep. A view by the jury of the subject-matter of the controversy is entirely a matter of statute. Our statute provides:

"C.S. '§ 8964. When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body, in the custody of the sheriff, to the place, which must be shown to them by a person appointed by the court for that purpose. * * *'

"According to the weight of authority construing similar statutes, it is error to permit the jury to view anything but the place in which material facts occur. It is error to permit them to view objects which can be introduced in evidence, and specifically, to view animate objects. State v. Landry, 29 Mont. 218, 74 P. 418; People v. Fitzpatrick, 80 Cal. 538, 22 P. 215; People v. Fagan, 99 Cal. XVIII, [4 Cal.Unrep. 87] 33 P. 846; Hays v. Territory, 7 Okl. 15, 54 P. 300. The purpose of the statute is not to permit the taking of evidence out of court, but simply to permit the jury to view the place where the transaction is shown to have occurred, in order that they may better understand the evidence which has been introduced. The viewing of objects which can be introduced in evidence, and especially the performing of experiments by the jury, constitute the taking of evidence, which is never permitted other than in the regular way upon the trial. People v. Conkling, 111 Cal. 616, 44 P. 314. We conclude that it was error for the court to permit the jury to inspect this sheep in the way in which it was done, and we are satisfied that

the jury were influenced thereby. The Attorney General contends that the error, if any, was not prejudicial because appellant himself admitted that the sheep inspected was one which he had in his possession, and one which the prosecuting witness claimed was stolen from him. However, the damaging thing about the inspection of the sheep was that the jury evidently concluded therefrom that appellant had endeavored to efface the original brand and had superimposed his own brand upon it, which he denied doing. For the jury to take evidence outside of court in regard to this very material matter was prejudicial."

Other cases which are of some importance upon certain phases of the principles applicable to the facts and matters of law in the instant case, are: State v. Fagan, 4 Cal.Unrep. 87, 33 P. 846, and State v. Landry, 29 Mont. 218, 74 P. 418. It is not possible to justify the "view," so-called, which occurred at Kirn's corral, appurtenant to his slaughterhouse, on the outskirts of Fallon, Nevada.

The lower court had stated: "I apprehend that counsel are going to make the request that the jury go to the Kirn corral sometime during the progress of the trial. Mr. Sheriff, you will make arrangements during the recess and between now and tomorrow morning to take the jury to the Kirn corral without the presence of other persons. * * * At the corral you'll observe the cattle that are in the corral." (Transcript of proceedings, Vol. 2, p. 139.)

The instant case is very similar, indeed, to State v. Main, supra. In that case, in Idaho, the sheep, as stated by the portion of the opinion above quoted was, at the time of the alleged view, in a barn, but not within the courthouse itself, where the trial was being held. Such view was neither at the place in which material facts had occurred, nor was it within the courthouse proper. That court, as hereinbefore quoted at greater length, clearly and unequivocally stated: "It is error to permit them

to view objects which can be introduced in evidence, and specifically, to view animate objects. State v. Landry, 29 Mont. 218, 74 P. 418; People v. Fitzpatrick, 80 Cal. 538, 22 P. 215; People v. Fagan, 99 Cal. XVIII, [4 Cal. Unrep. 87] 33 P. 846; Hays v. Territory, 7 Okl. 15, 54 P. 300. The purpose of the statute is not to permit the taking of evidence out of court, but simply to permit the jury to view the place where the transaction is shown to have occurred, in order that they may the better understand the evidence which has been introduced. *The viewing of objects which can be introduced in evidence, and especially the performing of experiments by the jury, constitute the taking of evidence, which is never permitted other than in the regular way upon the trial.* (Italics ours.) People v. Conkling, 111 Cal. 616, 44 P. 314. We conclude that it was error for the court to permit the jury to inspect this sheep in the way in which it was done, and we are satisfied that the jury were influenced thereby. * * * For the jury to take evidence outside of court in regard to this very material matter was prejudicial."

■ In 32 C.J.S., Evidence, sec. 601, page 454, it is stated that: "Demonstrative or real evidence, or evidence by inspection, is such evidence as is addressed directly to the senses of the court or jury without the intervention of the testimony of witnesses, as where various things are exhibited in open court." (Quoted from page 17 of the opening brief of appellant.)

In the instant case, as to the black white-faced cow above mentioned, it may be that no jurors indulged in experiments similar to that involved in the inspection of the sheep referred to in State v. Main, supra, in which the wool of the sheep was, by a juror, combed back and parted, and such juror nodded his head "knowingly" to the other jurors. As to such acts as to the black white-faced cow we have no knowledge. But, in the absence of the court and respective counsel, and of the defendant, some such experiments or examination would be quite

possible, and it needs little speculation to surmise that it could be entirely probable.

It is true that, unfortunately, an animal such as a cow could not feasibly or practicably be brought into the court room, and, by "autoptic proference," so to speak, be introduced and admitted in evidence. It is, however, only because such an unwieldly object as a cow could not be so introduced and admitted. The proper, and apparently the only alternative reasonably practicable would have been for the state in the case at bar, in the lower court, to have contented itself with the introduction and admission of photographs, if properly identified and sufficient foundation had been established, and thus to have been enabled to bring in and, perhaps, more fully to have developed, with those photographs, the pertinent facts as to the particular brands on the said cow, the one superimposed upon the other. Under such circumstances, at the regular trial the defendant and his attorneys would not have been prevented, by proper cross-examination, from inspecting the photographic evidence by examining into the various features of the brands upon the cow, and to have thoroughly investigated and definitely delved into the brands and their physical appearances and their reasonably probable effects. Also, it is entirely reasonable to believe that had the plan for arranging for a view been abandoned, or not entertained, a more thorough description and recitation of all pertinent features as to evidence of the physical brands and appearances upon the cow in question may have been possible.

██ In any event, certain well-settled requirements involving important constitutional questions cannot be dispensed with. Only in a *trial* of general jurisdiction authorized to hear and determine criminal cases may evidence such as was involved as to the black white-faced cow in question, be had. Proper procedure, under such circumstances, necessitated a trial, as distinguished from a view, and only such procedure in regard to said cow

could have been had. By dispensing with a trial in the instant case, and permitting a view, neither the defendant, nor his attorney, was present. The statute, N.C.L. 1929, Vol. 5, sec. 10921, provides: "If the prosecution be for a felony, the defendant must be personally present at the trial." Under the statute, the presence of the defendant, in a felony case, cannot be dispensed with, and by reason of the requirements of due process, both the defendant's presence and that of his counsel, throughout such a trial, must be had.

■ Among the great constitutional rights and privileges conferred upon an individual accused of a crime is that of confrontation. The defendant at such a trial must be actually confronted by the witnesses testifying against him. That right is guaranteed in federal courts by the Fifth Amendment, and by the constitutional provisions of many of the states.

Equally important as one of the indispensable constitutional guaranties is that of cross-examination. There are, also, other important constitutional or statutory requirements which are essential. There is no sufficient legal reason why this court, in the instant case, should treat or discuss, generally, in the matter of the present appeal, the sufficiency of the facts and circumstances constituting the evidence upon the trial in the lower court. Indeed, due to the fact that reversal is inevitable, it is apparent that, except as to the question of law now before us upon the appeal as to which we believe the ruling of the lower court was erroneous, it appears proper, in view of the requirement of a new trial, that, as above indicated, we should avoid any *intimation* as to any evidence in the record, other than such reference to the facts as is necessary in considering the question of the lawfulness of the alleged view which occurred at the Kirn corral near Fallon, Nevada, July 12, 1948.

For the reasons stated, the judgment adjudging the defendant guilty of the crime of grand larceny, and the order denying the defendant's motion for a new trial,

405

are reversed, and the cause is remanded to the lower court, and a new trial hereby ordered.

BADT, J., and HATTON, District Judge, concur.

EATHER, J., being absent on account of illness, the Governor commissioned Honorable WM. D. HATTON, Judge of the Fifth Judicial District, to sit in his place.